| | |
|---|---|
| **PATRICK HAIRSTON** | |
| | **CIVIL ACTION NO.:**     **2:21-CV-02088** |
| **PLAINTIFF,** | **SECTION:**     **"G" (3)** |
| **VERSUS** | **JUDGE:**     **NANNETTE JOLIVETTE BROWN** |
| **SUN BELT CONFERENCE, INC.,** | **MAGISTRATE:**     **DANA DOUGLAS** |
| **DEFENDANT.** | |

---

**MEMORANDUM IN SUPPORT OF**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

Defendant Sun Belt Conference, Inc. ("Sun Belt") respectfully submits this Memorandum in Support of its Motion for Summary Judgment.

## INTRODUCTION

Plaintiff is a former employee of Sun Belt whose employment contract was not renewed due to performance issues. Plaintiff alleges instead that the termination of his employment was because of his race. Plaintiff amended his Complaint to make clear that his race discrimination claim was brought exclusively under Louisiana's Employment Discrimination Law ("LEDL"), which only applies to employers with 20 or more employees, and not under Title VII, which applies to employers with 15 or more employees. This is fatal to Plaintiff's discrimination claim, as Sun Belt never employed 20 or more employees during the relevant time period. Even assuming the LEDL applies to Sun Belt, Keith Gill, Sun Belt's Commissioner and the first Black Commissioner in the history of Division I-FBS collegiate sports, made the decision to terminate Plaintiff's employment based on performance issues, not based in any way on Plaintiff's membership in the

same protected class as Mr. Gill.

Plaintiff has also brought claims for breach of contract and unpaid vacation time. However, Plaintiff admitted under oath that he was paid the full benefits due to him under his employment contract. And Sun Belt paid Plaintiff all accrued and unused vacation time along with his final paycheck. The Court should therefore grant summary judgment, dismissing all Plaintiff's remaining claims with prejudice.

## FACTUAL BACKGROUND

### I. Sun Belt's Business and Employees

Sun Belt operates its payroll on a semimonthly cycle, with each employee being paid on the 15th of every month and the last day of the month. Ex. 1, ¶ 4. Sun Belt's payroll records confirm that, in 2019, Sun Belt never employed more than 16 employees in any given payroll period. *Id.*, ¶ 5; Ex. 1-A. Sun Belt's former Commissioner, Karl Benson, confirmed that Sun Belt's list of employees was accurate during his deposition. *See* Ex. 6 at 14-15. The payroll records likewise establish that, in 2020, Sun Belt never employed more than 16 employees in any payroll period. Ex. 1, ¶ 6; Ex. 1-B. In his deposition, Plaintiff also did not dispute the roster of Sun Belt employees that is consistent with Sun Belt's payroll records. *See* Ex. 2 at 79; Ex. 2-4. These payroll records confirm that at no point during 2019 or 2020 (or any time thereafter) did Sun Belt have 20 or more employees during <u>any</u> payroll period. Ex. 1, ¶ 7.[1]

### II. Plaintiff's Employment with Sun Belt and the Termination of that Employment

Plaintiff began his formal employment with Sun Belt on May 1, 2016. Ex. 2 at 30. On March 21, 2019, Plaintiff signed a contract appointing him as the Associate Commissioner for

---

[1] Sun Belt's payroll records were produced to Plaintiff on September 19, 2022, in response to Request for Production 12, seeking production of any documents Sun Belt intends to admit as evidence at trial.

#100690747v1

Compliance for the Sun Belt (the "Employment Agreement"). *Id.* at 32; Ex. 2-2. The Employment Agreement guaranteed Plaintiff a minimum salary of $96,000 per year through June 30, 2020. Ex. 2-2, p. 1. The Employment Agreement also required Sun Belt to annually contribute 10% of Plaintiff's salary to a retirement account and required Sun Belt to provide medical and dental insurance coverage to Plaintiff. *Id.*, § 1, 2. The Employment Agreement provides for accrual of 11 days of vacation time, but states that unused leave time may only be carried forward through July 31st of the subsequent fiscal year. *Id.*, § 4; Ex. 2 at 93. The Employment Agreement allows Sun Belt's Commissioner to amend Sections 1-7 of the Agreement "as necessary." Ex. 2-2, p. 2.

While the Employment Agreement only guaranteed Plaintiff 11 vacation days for the 2019-2020 fiscal year, Sun Belt's Employee Policy Manual provided for more vacation time for employees of a certain tenure with the conference. After Plaintiff executed the Employment Agreement, Sun Belt implemented a new Employee Policy Manual. Ex. 1, ¶ 9; Ex. 1-C. The Employee Policy Manual provides, "Employees with tenure of three or more years are entitled to 15-days vacation annually (July 1-June 30)." Ex. 1-C at D-000187. Like the Employment Agreement, the Employee Policy Manual states that unused vacation time may only be carried forward through July 31. *Compare id. with* Ex. 2-2, § 4.

In 2016, then-Sun Belt-Commissioner Karl Benson informed Plaintiff of an open position for Associate Commissioner for Compliance and Governance at Sun Belt. Ex. 2 at 27. Plaintiff traveled to New Orleans to meet with Commissioner Benson and Sun Belt employees, including Chief Financial Officer Herbert Carter and Deputy Commissioner Kathy Keene. *Id.* at 28. Plaintiff commenced full-time employment with the Sun Belt in May 2016. *Id.* at 29-30.

In his role as the Associate Commissioner for Compliance and Governance, Plaintiff's job had two distinct but related primary responsibilities. With respect to compliance, Plaintiff was

responsible for fielding questions from the Sun Belt's membership (universities) and timely providing interpretations on NCAA rules and regulations. *Id.* at 33-34; 36. The standard procedure when compliance officers at member universities had a question was to ask Plaintiff, prior to directly asking the NCAA for guidance and interpretations. *Id.* at 38. In addition to these compliance responsibilities, Plaintiff's governance responsibilities included sending information to and gathering information from Sun Belt's member institutions about legislative proposals and bylaws from the NCAA. *Id.* at 41. Plaintiff was responsible for notifying Sun Belt membership about proposed NCAA legislation and soliciting feedback about those proposals, compiling the responses into a Sun Belt position on the proposed legislation. *Id.* at 42-43.

On May 1, 2019, Keith Gill took over from Karl Benson as Sun Belt Commissioner. Ex. 3 at 6. Keith Gill, like Plaintiff, is African American/Black. *Id.* at 123. When Mr. Gill became Commissioner, Plaintiff was "very excited" that Mr. Gill had been hired as the first African American Commissioner of the conference. Ex. 2 at 71-72. However, Mr. Gill implemented changes, such as a performance evaluation process that was not in place prior to his employment. Ex. 3 at 13. In addition to management-style changes, in the collegiate athletics industry, it is not uncommon for an incoming conference commissioner to make staff changes upon taking the position. Ex. 6 at 104.

Prior to Mr. Gill's tenure as Commissioner, in July or August of 2018, Plaintiff's family moved to North Carolina. Ex. 3 at 51. Even before Mr. Gill took over, there were noted issues with Plaintiff communicating with other Sun Belt staff about when he planned to be in North Carolina rather than New Orleans on work days. Ex. 5 at 49. Prior to the pandemic, Mr. Gill did not allow any Sun Belt employees to work remotely. Ex. 3 at 44. Plaintiff requested permission from Mr. Gill and Deputy Commissioner Kathy Keene to work from Charlotte prior to the pandemic. *Id.* at

40-41. Mr. Gill denied Plaintiff's request to work from Charlotte due to Plaintiff's sub-standard work performance and Sun Belt's lack of experience with remote working. *Id.* at 44.[2]

During his time at Sun Belt, Plaintiff frequently worked directly with Deputy Commissioner Keene. When Plaintiff began working for Sun Belt, he was friendly with Ms. Keene, and he does not recall ever complaining to anyone at Sun Belt about Ms. Keene. Ex. 2 at 50-51. After Mr. Gill became Commissioner, Plaintiff maintained a friendly relationship with Ms. Keene. Ex. 2 at 68. When Mr. Gill first became Commissioner, he met with Plaintiff, and Plaintiff did not mention anything negative about Ms. Keene and did not mention anything about discrimination. Ex. 3 at 15. After Mr. Gill became Commissioner, Ms. Keene worked with Plaintiff to try to improve Plaintiff's job performance in light of Mr. Gill's higher expectations. Ex. 5 at 89-90. Ms. Keene would work together with Plaintiff on documents before they would go to Mr. Gill to review. *Id.* at 92.

As Mr. Gill's time as Commissioner went on, Plaintiff "got concerned" about feedback from Mr. Gill that Plaintiff's work was not what Mr. Gill expected. Ex. 2 at 73. In April 2019, during the transition from Commissioner Benson to Commissioner Gill, Mr. Gill began having concerns with Plaintiff's job performance after a call related to NCAA governance. Ex. 3 at 45. As Mr. Gill's time as Commissioner continued, he noticed continued problems with Plaintiff's job performance. *Id.* at 50-52. Specifically, Mr. Gill testified as follows with respect to Plaintiff's job performance and Mr. Gill's decision to terminate Plaintiff:

> [T]he governance reports...never really got to the standard....[W]e had several conversations about, you know, not just forwarding e-mails...to the membership without summarizing them, without providing any kind of added value....
>
> So you think about the governance reports never got better. The committee process

---

[2] After the pandemic had somewhat subsided and employees were allowed to return to the office, Sun Belt transitioned to a Monday-Wednesday in the office/Thursday-Friday work-from-home optional policy. *Id.* at 41-42; Ex. 4 at 21.

is not one that he ever was able to do kind of on his own.... I think his interpretive abilities were not exactly strong for an FBS conference and he didn't log his interps, ...when he finally did log them...looking at what was in those interps was not really anything that I thought was questions that should be logged.

And so I think when you take the sum total of that work product, it's just hard to have a compliance person that you've got to prop up in the way that we really had to prop him up. You know, it just wasn't really going to work.

Ex. 3 at 50-52. In addition to those issues, Plaintiff's written work product required significantly more editing by Ms. Keene and Mr. Gill than his ultimate replacement. *Id.* at 54-56. As a result of Plaintiff's substandard performance, Ms. Keene began sitting in on compliance calls with Sun Belt membership during the pandemic to assist Plaintiff in addressing pandemic-related issues being faced by the membership. Ex. 5 at 93.

Keith Gill made the decision to terminate Plaintiff's employment. Ex. 3 at 67; *see also* Ex. 4 at 45. Mr. Gill discussed his decision to terminate Plaintiff with Bert Carter and Kathy Keene, but Mr. Gill was the one who made the decision. Ex. 3 at 67. When Mr. Gill discussed his decision to terminate Plaintiff with Ms. Keene and Mr. Carter, Mr. Gill had already made up his mind that he was likely going to terminate Plaintiff. *Id.* at 71-72. Ms. Keene did not want Sun Belt to terminate Plaintiff's employment, and she offered to do more to help support Plaintiff's work. *Id.* at 67. Specifically, Ms. Keene offered to try to coach Plaintiff and improve his performance to bring it into accordance with Mr. Gill's expectations, asking Mr. Gill to allow Plaintiff a few more months to improve. Ex. 5 at 101. Ms. Keene never asked Mr. Gill to terminate Plaintiff. Ex. 3 at 123-124.

When the pandemic began, it solidified Mr. Gill's decision to terminate Plaintiff's employment due to complexities Sun Belt was dealing with at the time. *Id.* at 72. Mr. Gill felt he had no choice but to terminate Plaintiff, "[b]ased on reviewing his work quality and also making a determination that we had to spend a lot of time supporting his work to try to get it to

standard...which really was going to detract from what we were trying to do, particularly myself and Kathy Keene that had to spend...time in the compliance and governance space trying to support his work." *Id.*

When asked whether Plaintiff's race played any role in the decision to terminate him, Mr. Gill testified, "[a]bsolutely not." *Id.* When asked in his deposition who discriminated against him because of his race, Plaintiff testified "Kathy Keene, Keith Gill, Herbert Carter." Ex. 2 at 79. However, Plaintiff did not recall ever hearing Ms. Keene, Mr. Gill, or Mr. Carter making any comments related to race or any derogatory racial comments. *Id.* at 80. When asked how Ms. Keene allegedly discriminated against him, Plaintiff claimed she did not reciprocate his attempts to be friendly towards her and that she only communicated with him when she needed something. *Id.* at 80-81. But Plaintiff did not recall anything that made him believe this alleged behavior had anything to do with his race. *Id.* at 81. Plaintiff likewise did not recall anything Bert Carter did towards him that was discriminatory based on race. *Id.* at 82; 83.

And Plaintiff testified that he did not recall whether Kathy Keene or Bert Carter supported his termination. *Id.* at 84-85. Plaintiff assumed, correctly, that Keith Gill was in support of his termination. *Id.* at 85. There is no evidence in the record to suggest that Ms. Keene or Mr. Carter made or influenced the decision to terminate Plaintiff. And this is because they did not; Keith Gill made the decision to terminate Plaintiff's employment. *See* Ex. 3 at 67. When asked how Mr. Gill discriminated against Plaintiff based on his race, Plaintiff testified only that a white female was hired as his replacement and that Mr. Gill did not associate with Plaintiff inside or outside of work, instead deferring things to Plaintiff's direct supervisor, Ms. Keene. *Id.* at 83-84. At no time during Plaintiff's employment with Sun Belt did he complain about race discrimination. *Id.* at 84.

## III.     Sun Belt's Actions Post Termination

#100690747v1

When Mr. Gill made the decision to terminate Plaintiff's employment, he decided to relieve Plaintiff of his duties prior to June 30, 2020, while continuing to pay Plaintiff all salary and benefits guaranteed under the Employment Agreement, because Mr. Gill "thought it would be helpful to him to give him the two months to try to work and find additional employment...." Ex. 3 at 66-67. Plaintiff was paid his full salary, as guaranteed by the Employment Agreement, through June 30, 2020. Ex. 2 at 87; Ex. 1, ¶ 10; Ex. 1-D. Sun Belt contributed 10% of Plaintiff's salary into his retirement fund for fiscal year 2019-2020. Ex. 2 at 87; Ex. 1, ¶ 11. Sun Belt provided Plaintiff medical and dental coverage until June 30, 2020. Ex. 2 at 87; Ex. 1, ¶ 12.

On July 1, 2019, Plaintiff accrued 15 days of vacation time, in accordance with the Sun Belt Employee Policy Manual. Ex. 1, ¶ 14. Plaintiff carried over 4.5 days of vacation time from the 2018-2019 fiscal year into July of 2019. *Id.*; Ex. 1-E. However, because Plaintiff only used 1.5 days of vacation time in July 2019, he forfeited three of the days carried over from the previous fiscal year under the "use it or lose it" policy in both the Employee Policy Manual and the Employment Agreement. Ex. 1, ¶ 14 (citing Ex. 1-C); *see also* Ex. 2-2, § 4 (providing for forfeiture of carryover vacation days not used in July of the succeeding fiscal year); Ex. 2 at 92-93.

Plaintiff used 8.5 total vacation days in the 2019-2020 fiscal year, 1.5 prior to the July 31, 2019 expiration of the previous year's days, and seven throughout the remainder of the fiscal year. Ex. 1, ¶ 14; Ex. 1-E. As of the termination of his employment, Plaintiff had eight unused vacation days. Ex. 1, ¶ 14; Ex. 1-E. *See also* Ex. 2 at 93-96. Bert Carter calculated Plaintiff's unused vacation days at the time of his termination, noting that, while Plaintiff believed he had 11 unused days, there were actually only eight unused days due to forfeiture of three carried over days from the prior year. Ex. 4 at 14. For payroll purposes, Plaintiff was treated as a Sun Belt employee through June 30, 2020, with Sun Belt paying him his full benefits and salary through the end of

8

his contract. *Id.* at 64.

Upon his termination from the Sun Belt's payroll system on June 30, 2020, Sun Belt paid Plaintiff $3,042.56 for his eight unused vacation days. Ex. 1, ¶ 13; Ex. 1-D; *see also* Ex. 2 at 100. When asked in his deposition what reason he had to dispute that he was owed eight days of unused vacation time, Plaintiff could not recall. Ex. 2 at 96. On June 29, 2020, the day before Plaintiff was terminated from Sun Belt's payroll system, Mr. Carter emailed Plaintiff and explained the payment of his unused vacation time. Ex. 1, ¶ 15; Ex. 1-F. Mr. Carter used contemporaneously created spreadsheets tracking Plaintiff's used vacation days to determine that he used 8.5 days during the 2019-2020 fiscal year. Ex. 4 at 10-14; Ex. 4-1. On July 2, 2020, Mr. Carter emailed Plaintiff proof of payment of his unused vacation days. Ex. 1, ¶ 16; Ex. 1-G. Mr. Carter also texted Plaintiff a chart explaining how Plaintiff's unused vacation days were calculated. *Id.*, ¶ 17; Ex. 1-H.

## IV. Nature and Stage of the Proceeding

Plaintiff filed his Original Complaint on or around October 8, 2021, in Civil District Court for the Parish of Orleans. (*See* R. Doc. 1-1.) The Original Complaint brought claims against Sun Belt for breach of Plaintiff's Employment Agreement, race discrimination, violations of the Louisiana Unfair Trade Practices Act, and failure to pay accrued vacation time. (*See id.*) On November 11, 2021, Sun Belt removed the action to this Court on the basis of federal question and diversity jurisdiction. (R. Doc. 1.) On November 23, 2021, Plaintiff filed his first Motion to Remand, arguing that there were no federal claims in the Complaint and that the forum-defendant rule barred removal on the basis of diversity. (R. Doc. 6.) The Court denied the Motion, in large part due to Plaintiff's attachment of his EEOC charge to the Complaint. (R. Doc. 21.)

On January 27, 2022, the Court granted leave to Plaintiff to file a First Amended Complaint. (R. Doc. 33.) The First Amended Complaint was nearly identical to the Complaint,

with the exception of the removal of the exhibits to the Complaint (the EEOC charge and right to sue letter Plaintiff received from the EEOC) and the removal of any request for punitive damages for race discrimination. (*Id.*) After the filing of the First Amended Complaint, Plaintiff filed a Second Motion to Remand on January 28, 2022. (R. Doc. 34.) In the Second Motion to Remand, Plaintiff made it clear that "Hairston's Complaint is Limited to State Law Claims." (R. Doc. 34-1 at 2.) On May 11, 2022, acknowledging that all federal claims, to the extent there were any, had been dismissed, the Court denied the Second Motion to Remand, finding that it had diversity jurisdiction and removal was procedurally proper. (R. Doc. 46.)

On July 20, 2022, the Court granted Sun Belt's Motion for Partial Dismissal of the claim under the Louisiana Unfair Trade Practices Act. (R. Doc. 47.) As of the filing of this Motion, Plaintiff has three claims against Sun Belt—race discrimination under the LEDL, breach of contract under Louisiana law, and failure to pay accrued vacation time under the Louisiana Wage Payment Act. As to each of these claims, there is no genuine issue of material fact, and Sun Belt is entitled to judgment as a matter of law.

<u>**LAW AND ARGUMENT**</u>

**I.    Summary Judgment Standard**

Summary judgment is appropriate when, after review of the pleadings and relevant evidence obtained in discovery, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the record would not allow a "rational trier of fact" to find in favor of the non-moving party, "then no genuine issue of fact exists and the moving party is entitled to judgment as a matter of law."[3]

---

[3] *Marquette Transp. Co. Gulf-Inland, LLC v. Navigation Mar. Bulgarea*, No. 19-10927, 2021 U.S. Dist. LEXIS 162405, at *6 (E.D. La. Aug. 26, 2021) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 576 (1986)).

#100690747v1

The party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Id.* However, as here, "Where the non-moving party bears the burden of proof at trial…the party moving for summary judgment may meet its burden by showing the Court that there is an absence of evidence to support the non-moving party's case." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). After the party moving for summary judgment satisfies its initial burden, the non-moving party must "identify specific evidence in the record, and articulate" how that evidence supports the non-moving party's claims. *Id.* (quoting *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994)).

## I. Sun Belt Does Not Meet the Statutory Definition of Employer and Therefore, Is Not Subject to the Louisiana Employment Discrimination Law.

First, the Court should grant summary judgment on Plaintiff's race discrimination claim, as Sun Belt is not an employer under the Louisiana Employment Discrimination Law (LEDL). The LEDL provides that "[t]he provisions of this Chapter shall apply only to an employer who employs twenty or more employees within this state for each working day in each of twenty or more calendar weeks in the current or preceding calendar year." La. R.S. § 23:302. Subject to this caveat, it defines employer as "a person, association, legal or commercial entity...receiving services from an employee and, in return, giving compensation of any kind to an employee." *Id.* "To meet the definition of an employer under the LEDL, one must (1) receive services from an employee and in return give compensation to that employee; and (2) meet the requisite number of employees prescribed by the statute." *Jones v. City of Monroe*, 2019 U.S. Dist. LEXIS 185264, at *16 (W.D. La. Oct. 8, 2019). Therefore, if the Sun Belt did not pay compensation to 20 or more employees at any point during the relevant time period, the Court must dismiss the claims.

In the context of Title VII cases, the United States Supreme Court found that the "payroll method" was the proper method for counting employees to determine whether an employer is

11

covered by Title VII. *See Whatley v. Hopewell*, No. 21-1185, 2021 U.S. Dist. LEXIS 231339, at *9 (W.D. La. Dec. 2, 2021) (citing *Walters v. Metropolitan Educational Enterprises, Inc.*, 519 U.S. 202, 210 (1997)). The Fifth Circuit subsequently affirmed a holding from this Court applying the "payroll test" from *Walters* to state law claims brought under the LEDL. *See id.* (citing *Mahl v. Nokia, Inc.*, 212 Fed. Appx. 279, 280 (5th Cir. 2006)). Louisiana district courts have consistently held that, to determine the number of employees of an employer under the LEDL, "it is appropriate to apply the 'payroll method' utilized in Title VII cases." *Id.*, at *9 n. 3 (collecting cases from all three of Louisiana's district courts applying the "payroll test" developed by the Supreme Court in *Walters* to LEDL claims). Examining affidavits and payroll records submitted by the defendant, the *Whatley* court granted summary judgment in favor of the defendant, which did not employ 20 or more employees within 20 calendar weeks of any given year. *Id.*, at *9-10.

In *Imbornone v. Tchefuncta Urgent Care*, this Court explained more precisely how district courts apply the *Walters* payroll test. No. 11-3195, 2013 U.S. Dist. LEXIS 102017, at *4-5 (E.D. La. July 19, 2013) (granting summary judgment as to Title VII and LEDL claims). "To determine whether an entity meets the statutory minimum for a given year, a district court 'look[s] first and primarily to whether the individual in question appears on the employer's payroll." *Id.*, at *5 (citing *Walters*, 519 U.S. at 210). Next, "the court uses 'traditional principles of agency law' to determine whether the individual has an 'employment relationship' with his alleged employer." *Id.*

In *Imbornone*, the plaintiff filed suit alleging discrimination that had occurred in 2010, so the Court examined the defendant's payroll records from 2009 and 2010, the "current [and] preceding years" for the purposes of LEDL coverage. *See id.*, at *5 ("Because Plaintiff's employment was terminated in 2010, the Court focuses on the years 2009 and 2010."). The payroll records "clearly reflect[ed] that [defendant] never employed more than twelve individuals during

2009. The records [were] equally clear that there were only three payroll periods in 2010 in which [defendant] employed fifteen or more persons." *Id.* The only evidence the plaintiff could present to try to controvert the payroll records was her own testimony that she was "sure we had at least 15 employees, I am assuming." *Id.* This fell "woefully short" of creating a fact issue. *Id.*

Similarly, Sun Belt's payroll records definitively establish that it never employed 20 or more employees in any pay period during 2019 and 2020, the year of Plaintiff's termination and the year preceding his termination. In Plaintiff's deposition, he presented no evidence to controvert Sun Belt's employee roster, instead conceding that he did not see any employees missing from the roster. Furthermore, because Sun Belt's payroll records demonstrate it did not compensate 20 or more employees at any point in 2019 and 2020, the Court need not even apply agency principles to determine whether each person on the payroll qualifies as an employee. Stated differently, even assuming all individuals listed on payroll are considered employees under the LEDL, the number is still well below the numerosity requirement of the LEDL.[4]

Plaintiff's LEDL claim is not viable as Sun Belt is not covered by the LEDL, the only statute under which Plaintiff brought a race discrimination claim in his Amended Complaint. Even still, as discussed *infra*, Plaintiff's Title VII claim would have been just as futile, as Plaintiff was terminated for legitimate, non-discriminatory reasons and Plaintiff has no evidence that the decision maker—a member of the same protected class—acted with or was influenced by discriminatory animus. Therefore, the Court should grant summary judgment as to Plaintiff's claim for race discrimination under the LEDL.

---

[4] Sun Belt recognizes that the statutory definition of an employer under Title VII is an entity employing 15 or more employees during the requisite time period, and that there may have been a question of fact as to whether Sun Belt satisfied the statutory definition of employer under Title VII. *See Jones*, 2019 U.S. Dist. LEXIS 185264, at *16-17 (addressing difference between statutory definition of employers in Title VII and LEDL). Nevertheless, Plaintiff's First Amended Complaint and subsequent argument in the Second Motion to Remand left no doubt—Plaintiff abandoned his Title VII claim and chose to pursue relief solely under the LEDL.

#100690747v1

## II. Summary Judgment Is Warranted on Plaintiff's Breach of Contract Claim.

There is no genuine dispute of material fact that Plaintiff received all the benefits to which he was entitled under the Employment Agreement. A breach of contract action under Louisiana law has three elements: "(1) the obligor's undertaking an obligation to perform, (2) the obligor failed to perform the obligation, and (3) the failure to perform resulted in damages to the obligee." *Riley v. Cantrell*, No. 19-13950, 2021 U.S. Dist. LEXIS 121953, at *12 (E.D. La. June 30, 2021) (quoting *IberiaBank v. Broussard*, 907 F.3d 826, 835 (5th Cir. 2018)). Plaintiff cannot establish a failure to perform or damages, the first and third elements.

### A. Sun Belt did not breach the Employment Agreement.

To establish breach of an employment contract, a plaintiff "must show that there has been a breach of the terms of his employment agreement; only the breach of an express provision of a contract can form the basis of a breach of contract claim." *Id.*, at *16. The Employment Agreement imposes the following duties on Sun Belt: (1) payment of a minimum annual salary of $96,000 through June 30, 2020; (2) retirement contributions equal to 10% of Plaintiff's salary through June 30, 2020; and (3) provision of medical and dental coverage through June 30, 2020. In the Complaint, Plaintiff alleges only that Sun Belt "breached the employment contract with Hairston where they terminated him before the end of his yearlong contract." (R. Doc. 1-1, ¶ 19.) However, looking at the "express provision[s]" of the Employment Agreement, it is clear there is no genuine dispute of fact as to whether Sun Belt breached.

*First*, both Plaintiff and Sun Belt's CFO have testified that Plaintiff was paid his salary through June 30, 2020. Sun Belt's payroll records confirm that Plaintiff received his full salary through the end of the Employment Agreement's term. *Second*, both Plaintiff and Sun Belt's CFO have testified that Sun Belt made the required retirement fund contributions for the entire fiscal

#100690747v1

year of the employment period set forth in the Employment Agreement. And *third*, Sun Belt provided Plaintiff with benefits through June 30, 2020. Plaintiff argues that he was terminated on or around April 30, two months prior to the end of the contract; however, Plaintiff was merely relieved of his employment duties on April 30, while he was still paid as a Sun Belt employee and given full benefits under the Employment Agreement until June 30. That is, Plaintiff was relieved of any duties on behalf of Sun Belt, at the discretion of the Commissioner as set forth in the Employment Agreement, but Sun Belt did not fail to perform any of its obligations to Plaintiff under the Agreement. Therefore, Sun Belt is entitled to summary judgment on the breach of contract claim.

### B. Any failure to perform did not cause Plaintiff actionable damages.

Even if Sun Belt's relieving Plaintiff of his duties prior to June 30, 2020 is considered a failure to perform an obligation under the Employment Agreement, Sun Belt is entitled to judgment as a matter of law because Plaintiff cannot meet the third element of the breach of contract claim. As noted above, it is undisputed that Plaintiff received all benefits due to him under the terms of the Employment Agreement. Therefore, any failure to perform, which, if established, would only be a failure to allow Plaintiff to perform duties on behalf of Sun Belt for an additional two-month period, did not result in any damages to Plaintiff.

Plaintiff seeks damages for loss of wages, loss of benefits, mental anguish, emotional distress, embarrassment, and loss of reputation. But Plaintiff admitted under oath, and the uncontroverted evidence clearly establishes, that Plaintiff did not lose any wages or benefits due to him under the terms of the Employment Agreement. And the remaining damages sought by Plaintiff are barred as a matter of law for breach of an employment agreement.

As to Plaintiff's alleged nonpecuniary damages, mental anguish, emotional distress,

embarrassment, and loss of reputation, Louisiana law only provides for the recovery of nonpecuniary losses "when the contract, because of its nature, is intended to gratify a nonpecuniary interest" *and* "the obligor knew, or should have known, that his failure to perform would cause that kind of loss." La. Civ. Code art. 1998.[5] The Louisiana Supreme Court has interpreted this provision "to provide for recovery when the object of the contract was intellectual, moral, or religious enjoyment." *See Meredith v. Louisiana Fed'n of Teachers*, 209 F.3d 398, 406 (La. App. 5 Cir. 2000) (citing *Meador v. Toyota of Jefferson, Inc.*, 332 So.2d 433, 435 (La. 1976)). Courts applying Louisiana law have routinely held that employment contracts are not those "intended to gratify a nonpecuniary interest."[6] Because Plaintiff can present no evidence that his contract was intended to gratify a significant nonpecuniary interest and because there is no evidence that Sun Belt knew any failure to perform would cause a nonpecuniary loss, these damages are not recoverable as a matter of law.

Plaintiff likewise seeks punitive damages, which are not available for breach of contract under Louisiana law. "Under Louisiana law, there can be no punitive damages for breach of contract, even when a party has acted in bad faith in breaching the agreement." *Taylor v. Clarke Power Servs.*, No. 16-15890, 2017 U.S. Dist. LEXIS 167612, at *19 (E.D. La. Oct. 11, 2017) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 54 (1991)). Therefore, Plaintiff's claim for punitive damages fails as a matter of law.

For each category of damages Plaintiff seeks, Plaintiff has either experienced no damages

---

[5] Comment (c) to article 1998 provides an illustrative list of contracts intended to gratify a nonpecuniary interest. "A contract made for the gratification of a nonpecuniary interest means one intended to satisfy an interest of a spiritual order, such as a contract to create a work of art, or a contract to conduct scientific research, or a contract involving matters of sentimental value." La. Civ. Code art. 1998, cmt. (c).

[6] *See, e.g., id.*; *Kosmala v. Paul*, 644 So.2d 856, 858-59 (La. App. 1 Cir. 1994); *Landry v. PosiGen, Inc.*, No. 17-8444, 2019 U.S. Dist. LEXIS 37559, at *22 n. 2 (E.D. La. Mar. 8, 2019); *Shepard v. Phycor of Ruston, Inc.*, 711 So.2d 288, 291 (La. App. 2 Cir. 1997); *Cooper v. Lafayette Parish Sch. Bd.*, No. 21-428, 2022 La. App. Unpub. LEXIS 1, at *14-15 (La. Ct. App. 3 Cir. Jan. 12, 2022).

#100690747v1

as a result of any failure to perform, or the damages are not recoverable as a matter of law. Damages are an essential element of a breach of contract claim. *Favrot v. Favrot*, 68 So.3d 1099, 1108-09 (La. Ct. App. 2011) (collecting cases). Because Plaintiff was not damaged in this case, he cannot establish a *prima facie* element of his claim. *See Smitty's Supply, Inc. v. Hegna*, 2019 U.S. Dist. LEXIS 36689, at *9 (E.D. La. Mar. 7, 2019) (granting summary judgment on breach of employment contract claim with no damages). Therefore, even if there is a fact issue as to whether Sun Belt failed to perform its obligations under the Employment Agreement, it is still entitled to summary judgment on the breach claim.

### III. Summary Judgment Is Warranted on Plaintiff's Vacation Pay Claim.

#### A. Sun Belt paid Plaintiff for all unused vacation time.

There is no genuine issue of material fact as to whether Sun Belt paid Plaintiff for all accrued but unused vacation time at the termination of his employment. The Louisiana Wage Payment Act (LWPA) requires an employer to "pay the amount then due under the terms of employment...on or before the next regular payday or no later than fifteen days following the date of discharge, whichever occurs first." La. R.S. § 23:631. Vacation pay is considered an "amount then due" when an employee has accrued the right to take vacation time with pay and the employee has not been compensated for the time as of the date of discharge. *Id.*; *see also, Kingsbery v. Paddison*, 2021 U.S. Dist. LEXIS 90514, at *14 (E.D. La. May 12, 2021) ("Vacation pay is considered an amount then due in accordance with the employer's vacation policy.").

Plaintiff's Employment Agreement provided that he was to accrue 11 days of paid vacation time for the 2019-2020 fiscal year. Sun Belt's Employee Policy Manual provided for the accrual of 15 days per year for employees with more than three years of tenure. At most, Plaintiff accrued 15 days of paid vacation for the period of July 1, 2019-June 30, 2020. Both the Employment

17

Agreement and Employee Policy Manual incorporate a "use it or lose it" policy with respect to the accrual of vacation days. That is, unused vacation days carried over from the preceding fiscal year must be used in July of the succeeding fiscal year or those days are lost.[7]

Plaintiff had 4.5 days of vacation time carry over from the 2018-2019 fiscal year. Because Plaintiff only used 1.5 days of vacation time in July 2019, he forfeited the other three days that carried over from the 2018-2019 fiscal year under Sun Belt's "use it or lose" policy. Therefore, as of August 1, 2019, Plaintiff had only 15 days of vacation time. Sun Belt's undisputed records establish that Plaintiff took seven of these vacation days after August 1, 2019, leaving him with eight unused vacation days at the termination of employment. On June 30, 2020, the same day he received his final salary payment through Sun Belt's payroll system, Sun Belt paid Plaintiff $3,042.56 for his eight unused vacation days. When asked in his deposition what reason he had to dispute that he was owed eight days of unused vacation, Plaintiff could not recall. Therefore, Plaintiff has no valid claim for unpaid wages. He was paid all accrued vacation days at the termination of his employment.

In addition to alleging that Plaintiff was not paid for three accrued vacation days, Plaintiff alleged in the Complaint that Sun Belt improperly delayed in paying his unused vacation time. Essentially, Plaintiff alleges in the Complaint that Sun Belt delayed the payment of vacation from the moment of termination until Plaintiff's final paycheck issuance under the Agreement on June 30, 2020. Even if true, Plaintiff never made demand for payment prior to June 30, when he was paid all amounts due. The LWPA provides for penalty wages "for ninety days wages at the employee's daily rate of pay, or else for full wages from the time the employee's demand for

---

[7] It is worth noting that the Louisiana Supreme Court has endorsed "use it or lose it" policies like the one in this case and found if the vacation is not used in accordance with the policy, it is not an amount due at termination under the LWPA. *See Wyatt v. Avoyelles Par. Sch. Bd.*, 2001-3180 (La. 12/04/02); 831 So.2d 906, 913-14.

#100690747v1

payment is made until the employer shall pay or tender the amount of unpaid wages due to such employee, whichever is the lesser amount of penalty wages." La. R.S. § 23:632. "Louisiana Revised Statute 23:632 is penal in nature and, therefore, must be strictly construed." *Haber v. Ocean Canyon Props.*, 251 So.3d 454, 458 (La. App. 1 Cir. 2018).

The only communication regarding vacation time was on June 29 when Plaintiff asked Sun Belt CFO Bert Carter how much vacation time he would be receiving with his final paycheck. A demand for payment under the LWPA "must be fairly precise and certain." *Lambert v. Usry & Weeks*, 643 So.2d 1280, 1281 (La. App. 5 Cir. 1994). Here, Plaintiff did not make a demand for immediate payment in his June 29 email to Mr. Carter. Instead, Plaintiff asked Mr. Carter, "How many unused vacation days will I get paid for? What is the dollar amount? Note: my records which I ensured were aligned with the SBC office's records kept on file indicate I had eleven (11) unused vacation days." Ex. 1-F. This was not a demand for payment; rather, it was a question about what Plaintiff *would* be paid the following day in conjunction with his final paycheck. And in this email, Plaintiff makes no allegation that he has not been timely paid, instead explicitly contemplating that he would be paid on or after June 30.

At the time of his termination from the payroll system on June 30, 2020, Plaintiff had eight accrued days of vacation. Sun Belt paid him for those days on that date. Plaintiff did not make demand for payment prior to the payment of all days owed on June 30, 2020. Therefore, the Court should grant summary judgment on Plaintiff's Louisiana Wage Payment Act claim.

**B. To the extent there is a fact issue as to accrued vacation time, the dispute is in good faith and penalties are inappropriate.**

Even if there is a dispute as to whether Plaintiff had accrued eight or eleven vacation days, any such dispute is in good faith, and the Court should grant summary judgment to the extent Plaintiff seeks penalty wages. "When the court finds that an employer's dispute over the amount

of wages due was in good faith, but the employer is subsequently found by the court to owe the amount in dispute, the employer shall be liable only for the amount of wages in dispute plus judicial interest incurred from the date that the suit is filed." La. R.S. § 23:632. That is, "If a bona fide dispute exists over the amount of wages due, an employer's failure to pay is not an arbitrary refusal and no penalties will be awarded." *Steak v. Hat World, Inc.*, 191 So.3d 712, 715-16 (La. App. 4 Cir. 2016). Penalties are instead available "when the employer is arbitrary or sets out procedural pitfalls for the employee or is merely negligent in failing to pay past due wages." *Id.* at 716.

Here, there is no question of fact as to whether there was, at the very least, a bona fide dispute between Plaintiff and Sun Belt over unused vacation time. Sun Belt paid Plaintiff eight days of vacation time immediately on the date it considered to be his discharge from employment for the purposes of payroll, that is, the same day he received his final paycheck from the Sun Belt and he was removed from Sun Belt's health insurance plan. Additionally, looking to the forfeiture provisions of the Employment Agreement and the Employee Policy Manual, Sun Belt had a good faith (and correct) basis to calculate Plaintiff's unused vacation time as eight days, rather than 11 days. Even during Plaintiff's deposition, he could provide no evidentiary support to contradict Sun Belt's calculations of the eight days owed to him upon termination.

Therefore, even if fact issues remain as to whether Plaintiff was properly paid his accrued but unused vacation time, those fact issues are indicative of a bona fide dispute, and the Court should grant summary judgment to the extent Plaintiff seeks penalty wages.

IV.     **In the Alternative, Sun Belt Terminated Plaintiff's Employment for Legitimate, Non-Discriminatory Reasons, and Summary Judgment Is Proper on Plaintiff's Race Discrimination Claim.**

Alternatively, to the extent the Court determines there is a genuine issue of material fact as to whether Sun Belt employs the requisite number of employees to be covered by the LEDL,

20

summary judgment is still appropriate, as Sun Belt's decision not to renew Plaintiff's employment contract was made for legitimate, non-discriminatory reasons. Louisiana's federal district courts evaluate claims for employment discrimination under the LEDL under the same framework as claims under Title VII. "As Title VII and the LEDL share the same scope, claims under the LEDL are analyzed under the Title VII framework and jurisprudence."[8] Therefore, to the extent a claim would fail under Title VII, it would also fail under the LEDL.

Race discrimination may be proven using direct or circumstantial evidence. *Offord v. City of Fulshear*, 861 Fed. App'x 536, 540 (5th Cir. 2021). Direct evidence "is evidence that proves the fact of discriminatory animus without inference or presumption." *Brown v. Home Depot U.S.A., Inc.*, No. 14-1470, 2015 U.S. Dist. LEXIS 56874, at *20 (E.D. La. Apr. 30, 2015). To survive summary judgment without direct evidence of discrimination, "the plaintiff must demonstrate, pursuant to the burden shifting framework found in *McDonnell Douglas Corp. v. Green*, that: (1) he was in a protected class; (2) he was qualified for the position; (3) he suffered adverse employment action; and (4) he was replaced by someone outside of the protected class or treated less favorably than similarly situated employees." *Id.*

If the plaintiff can establish these elements, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for termination. *Id.*, at *20-21. "The defendant is not required to show that the employment decision was proper, only that it was not discriminatory." *Id.*, at *21. If the defendant satisfies this burden, "the burden shifts back to the plaintiff to show that any non-discriminatory purposes offered by the defendant are merely pretext for discrimination by presenting evidence of disparate treatment or demonstrating that the proffered

---

[8] *Wilkerson v. Parish of Jefferson*, No. 20-3031, 2021 U.S. Dist. LEXIS 207064, at *43 (E.D. La. Oct. 27, 2021) (citing *DeCorte v. Jordan*, 497 F.3d 433, 437 (5th Cir. 2007)); *see also Lynch v. Fluor Fed. Petro. Operations, LLC*, No. 19-13200, 2021 U.S. Dist. LEXIS 225634, at *4 (E.D. La. Nov. 23, 2021).

#100690747v1

explanation is false." *Id.*

Here, because Plaintiff cannot establish that the legitimate, non-discriminatory reason Sun Belt declined to renew his employment contract is mere pretext, even an evaluation of the race discrimination claim on the merits should lead the Court to granting summary judgment.

### A. There is no direct evidence of discrimination.

There is no direct evidence of discrimination on the record, or even alleged by Plaintiff. "Direct evidence is evidence which, if believed, proves the fact without inference or presumption." *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 992 (5th Cir. 2005). "[D]irect evidence is rare." *Clark v. Champion Nat'l Sec., Inc.*, 952 F.3d 570, 579 (5th Cir. 2020) (quoting *Portis v. First Nat'l Bank of New Albany*, 34 F.3d 325, 328 (5th Cir. 1994)). To constitute direct evidence of discrimination, "workplace comments must: (i) relate to a protected classification, such as race; (ii) be temporally proximate to the adverse employment decision at issue; (iii) be made by someone with authority over that decision; and (iv) relate to the decision." *Harris v. Drax Biomass, Inc.*, 813 Fed. Appx. 945, 947 (5th Cir. 2020) (citing *Clark*, 952 F.3d at 581).

Here, Plaintiff has submitted no evidence, nor even alleged, that there was any discriminatory behavior temporally proximate to and related to Sun Belt's decision to terminate his employment. Nor has Plaintiff alleged any race-related comments being made by the person with authority over the decision to terminate him, Keith Gill.

### B. There is no genuine issue of material fact as to whether Sun Belt's legitimate, non-discriminatory reason for terminating Plaintiff is pretext.

For the limited purposes of this Motion, Sun Belt does not dispute that Plaintiff has met his *prima facie* case.[9]

---

[9] Sun Belt maintains that Plaintiff was not qualified for his position and explicitly reserves this argument should the case proceed to trial on the merits of this claim.

The burden then shifts to Sun Belt to articulate a legitimate non-discriminatory reason for termination. Sun Belt declined to renew Plaintiff's employment contract because of performance issues. The burden of establishing a legitimate, non-discriminatory reason for termination is "one of production, not persuasion." *Brown*, 2015 U.S. Dist. LEXIS 56874, at *21 (citing *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000)). "'[E]ven an incorrect belief that an employee's performance is inadequate constitutes a legitimate, non-discriminatory reason' for adverse employment action." *Id.* (internal citation omitted).

Here, Keith Gill testified extensively as to the legitimate, non-discriminatory reason for terminating Plaintiff's employment. Mr. Gill pointed to performance issues including inadequate summaries of NCAA governance documents, failure to prepare for calls with board of directors representatives, and failure to provide sufficient compliance guidance to the Sun Belt's member institutions. The stated reason for termination, inadequate job performance, is a legitimate non-discriminatory reason for termination. *See Hamilton v. AVPM Corp.*, 593 Fed. Appx. 314, 321 (5th Cir. 2014) (finding poor job performance to be a legitimate, non-discriminatory reason); *Singleton v. YMCA of Greater Houston*, 788 Fed. Appx. 292 (5th Cir. 2019) (same).

Because Sun Belt has met its burden of production of demonstrating a legitimate, non-discriminatory reason for Plaintiff's termination, the burden shifts back to Plaintiff to establish that the stated reason was merely pretext for race discrimination.

*First*, there is a strong presumption that Sun Belt's proffered reason for Plaintiff's termination is not pretext for discrimination, as Plaintiff and the decision maker who decided to terminate him, Keith Gill, are members of the same protected class. Both Plaintiff and Keith Gill are Black. "When decision makers are in the same protected class as the discharged employee,

23

there is a presumption that unlawful discrimination is not a factor in the discharge."[10]

Here, there is no genuine dispute of material fact that Keith Gill made the decision to terminate Plaintiff's employment and that Keith Gill and Plaintiff are members of the same relevant protected class. Mr. Gill testified that the decision to terminate Plaintiff's employment was his own, and while he discussed it with Kathy Keene and Bert Carter, Ms. Keene tried to convince Mr. Gill to retain Plaintiff as an employee, and Mr. Carter never expressed an opinion as to whether Plaintiff should be terminated. Ex. 4 at 48. Mr. Carter also testified he had no power to recommend employee terminations to Mr. Gill. *Id.* at 41. Moreover, Mr. Gill testified that his mind was made up to terminate Plaintiff's performance based on performance issues prior to any conversations about the matter. And Plaintiff had no evidence or reason to believe that anyone other than Mr. Gill was involved in making the decision to terminate Plaintiff's employment. Therefore, there is a presumption that Plaintiff was terminated for non-discriminatory reasons.

*Second*, there is no evidence on the record that race played any part in Mr. Gill's decision to terminate Plaintiff. To establish pretext, a plaintiff must "do more than just dispute the underlying facts and argue that [the employer] made the wrong decision." *LeMaire v. Louisiana*, 480 F.3d 383, 391 (5th Cir. 2007). "Merely disagreeing with an employer's negative performance assessment is insufficient, and a plaintiff cannot survive summary judgment without an actual showing that the adverse employment action was the result of discrimination." *Brown*, 2015 U.S. Dist. LEXIS 56874, at *36.

Here, there is no evidence that Plaintiff's termination had anything to do with his race. When asked in his deposition the ways in which he believed Sun Belt discriminated against him,

---

[10] *Agoh v. Hyatt Corp.*, 992 F. Supp. 2d 722, 744 (S.D. Tex. Jan. 13, 2014) (citing *Rhodes v. Guiberson Oil Tools*, 75 F.3d 989, 1002 (5th Cir. 1992)); *see also McMichael v. Transocean Offshore Deepwater Drilling, Inc.*, 994 F.3d 447, 460 (5th Cir. 2019).

Plaintiff largely could not recall. Plaintiff noted that he was replaced by a white female, which Sun Belt does not dispute, but that is, at most, sufficient to establish a *prima facie* case of race discrimination, not to establish pretext and survive summary judgment. Plaintiff has not pointed to any comparators, that is, any employees outside Plaintiff's protected class who were not terminated or were otherwise treated more favorably than him when experiencing similar performance issues.

When asked specifically why he believed Keith Gill's decision to terminate him had anything to do with race, Plaintiff responded that Mr. Gill had "hired a white female as [his] replacement" and never associated with Plaintiff "outside of work or inside of work," instead telling Plaintiff to work through his direct supervisor. This testimony does not relate to Plaintiff's race in any way. A boss not associating with an employee, inside or outside of work, is not evidence of racial animus, particularly when there is no evidence on the record that that boss *did* associate with employees outside of the protected class. Plaintiff simply has no evidence to suggest that Keith Gill's decision to terminate him has anything to do with race.

Therefore, Plaintiff cannot establish evidence that Sun Belt's legitimate, non-discriminatory reason for his termination was merely pretext for race discrimination. Even if the LEDL applies to Sun Belt, the Court should grant summary judgment on the race discrimination claim.

## CONCLUSION

For the foregoing reasons, Defendant Sun Belt Conference, Inc. respectfully requests the Court grant its Motion for Summary Judgment, dismissing all claims against it by Plaintiff Patrick Hairston with prejudice.

#100690747v1

Dated: October 4, 2022                          Respectfully submitted,

                                                */s/ Jennifer Kogos*
                                                JENNIFER KOGOS (#25668)
                                                JASON CULOTTA (#35731)
                                                JACOB J. PRITT (#38872)
                                                **JONES WALKER LLP**
                                                201 St. Charles Avenue, 51st Floor
                                                New Orleans, Louisiana 70170-5100
                                                Direct Telephone: (504) 582-8154
                                                                  (504) 582-8177
                                                                  (504) 582-8643
                                                Direct Facsimile:  (504) 589-8154
                                                                  (504) 589-8177
                                                                  (504) 589-8643
                                                jkogos@joneswalker.com
                                                jculotta@joneswalker.com
                                                jpritt@joneswalker.com

                                                ***Counsel for Defendant, Sun Belt Conference Inc.***

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that a copy of the above and foregoing pleading has been served

upon all counsel of record by electronic filing with the Court's CM/ECF system, this 4th day of

October, 2022.

                                                /s/ Jennifer F. Kogos
                                                JENNIFER F. KOGOS

26