## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

PATRICK HAIRSTON,

Plaintiff,

v.

SUN BELT CONFERENCE INC.,

Defendant.

\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*

CIVIL ACTION NO: 2:21-cv-02088

SECTION: G     DIVISION: 3

JUDGE: NANNETTE JOLIVETTE BROWN

MAGISTRATE JUDGE: DANA DOUGLAS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

     **NOW INTO COURT**, through undersigned counsel, comes the Plaintiff, **PATRICK HAIRSTON** ("Plaintiff"), who respectfully files this opposition to Defendant's Motion for Summary Judgment as follows: at the outset of this Motion, it is critical that the court understands discovery is continuing and the Magistrate Judge has recently ruled that the Plaintiff's First Requests for Production be resubmitted to the Defendant by November 1, 2022.[1] Discovery is continuing and the plaintiff is still gathering evidence to rebut the Sun Belt's Motion. Further, the submission date requested by the Defendant was never ordered by this Honorable Court, which has led to the untimely filing of this Opposition. Undersigned counsel was not aware that the submission date was set until immediately preceding its filing. A Motion to Continue the submission date was filed[2], as the issues in the Motion are not ripe for review, while discovery is still ongoing on precisely these issues.

---

[1] R. Doc. 67
[2] R. Doc. 70

**PREAMBLE**

So that this Honorable Court understands the gravity of this Motion and Opposition, Plaintiff the depositions of Keith Gill, Kathy Keene, and Herbert Carter illustrate that the Sun Belt cannot stick to a narrative regarding the termination of Patrick Hairston.[3] [4] [5] Further, Plaintiff points out that Defendant relies upon ONLY self serving testimony. In fact, it cannot find a single minority employee to support its position that the termination of Patrick Hairston did not involve race. Ironically, the individuals that Defendant relies upon as the basis for its position that individuals outside of the Sun Belt took issue with Hairston's work have not been deposed, have not provided affidavits, refuse to speak to Plaintiff's counsel[6], and in fact are re-canting their statements through their attorneys. As stated herein, this Motion for Summary Judgment is simply another attempt by the Sun Belt to bully Mr. Hairston with its *post hac* narrative created by its lawyers.

**SUMMARY JUDGMENT STANDARD**

In the Fifth Circuit, it is well-established that district courts should determine motions for summary judgment by viewing the evidence "in the light most favorable to the party opposing the motion." *Shackelford v. Deloitte & Touche, L.L.P.*, 190 F.3d 398, 409 (5th Cir.1999). This standard was expressed similarly by the United States Supreme Court in *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.3d 205 (2000), when it stated that "on a motion for summary judgment, the court must draw all reasonable inferences in favor of the non-

---

[3] Exhibit A, Deposition of Keith Gill, p. 67.
[4] Exhibit B, Deposition of Herbert Carter, page 41.
[5] Exhibit I, Deposition of Kathy Keene, page 97, 98, 101 -103, wherein, Ms. Keene takes a back seat regarding whether to terminate Hairston, although she states that she was Patrick's supervisory after Gill was Commissioner. However, as to other employees terminations, which occurred on the same day as Patrick, she testifies that she helped make termination decisions based off of her supervisory capacity of those employees.
[6] Exhibit C, Email between counsel and Kelsey Solis.

moving party, and it may not make credibility determinations or weigh the evidence." Reeves, at 2110 (emphasis added).

In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) the United States Supreme Court held, "…at the summary judgment phase the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, at 2511. The Court added, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. at 2513.

In *Eastman Kodak Company v. Image Technical Services, Inc.*, 504 U.S. 451, 112 S.Ct. 2072, 19 L.Ed.2d 265 (1992), the United States Supreme Court held that "the evidence of [respondents] is to be believed, and all justifiable inferences are to be drawn in [their] favor." *Eastman Kodak*, at 2077.

## I.     The Sun Belt Employed More Than Twenty Employees During the Requisite Period under the Louisiana Employment Discrimination Law (LEDL).

The Sun Belt employed more than 20 employees throughout Hairston's tenure at the Sun Belt.

Louisiana courts look to federal jurisprudence to interpret Louisiana discrimination laws because of the similarity in scope to the federal prohibition against discrimination provided in Title VII of the Civil Rights Act of 1964, as amended. 42 U.S.C.A. §§ 2000e to 2000e–17. **4 *King v. Phelps Dunbar, L.L.P.,* 98–1805 (La.6/4/99), 743 So.2d 181. In *Arbaugh v. Y & H Corp.,* 380 F.3d 219 (5th Cir.2004). The Fifth Circuit outlined the test used to determine whether persons are

employees for purposes of Title VII: [W]e determine whether a plaintiff is an "employee" for Title VII purposes by applying the hybrid economic realities/common law control test first advanced in *Spirides v. Reinhardt,* 613 F.2d 826, 831 (D.C.Cir.1979).... Although other factors are relevant, the most important factor is "the extent of the employer's right to control the 'means and manner' of the worker's performance." *Id*. The factors pertinent to this inquiry include: (1) ownership of the equipment necessary to perform the job; (2) responsibility for costs associated with operating that equipment and for license fees and taxes; (3) responsibility for obtaining insurance; (4) responsibility for maintenance and operating supplies; (5) ability to influence profits; (6) length of the job commitment; (7) form of payment; and (8) directions on schedules and on performing work. *Id*.

This Circuit has also recognized the additional factors identified in *Spirides,* that are relevant to this inquiry, including: (1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the "employer" or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated; i.e., by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the "employer;" (9) whether the worker accumulates retirement benefits; (10) whether the "employer" pays social security taxes; and (11) the intention of the parties. *Piazza v. Manuel*, 2004-1116 (La. App. 3 Cir. 4/6/05), 899 So. 2d 121, 123 *citing Arbaugh,* 380 F.3d at 226–228 (citations omitted). The traditional definition of employee within the context of the LEDL may

include independent contractors as well.[7] Independent contractors in many case provided services to and received compensation, therefore, he or she may be their employer under the plain language of La.R.S. 23:302(2)." *Piazza v. Manuel*, 2004-1116 (La. App. 3 Cir. 4/6/05), 899 So. 2d 121, 123–24.

Sun Belt website shows that it had multiple Officials Coordinators as well as numerous paid officials to referee various games that are not included on their payroll record or in their affidavits.[8] These include Paul Gillie, Mike Eades, Lisa Mattingly, John McDaid[9], Rachel Woo, Christie Cornwell, and Anne Pufahl.[10] Those officials alone total seven additional employees who receive paychecks from the Sun Belt that are easily identified without having responsive information requested in discovery to address the Sun Belt's argument. Without requiring the court to perform extensive mathematics, the Sun Belt had between 14-16 employees by its own admission during the requisite time period. Once we add in these "forgotten" employees, it becomes even more clear that the Sun Belt had 21-23 employees at minimum listed on its own website during the applicable period. The Sun Belt provides the standard as follows: "'To meet the definition of an employer under the LEDL, one must (1) receive services from an employee and in return give compensation to that employee; and (2) meet the requisite number of employees prescribed by the statute." Jones v. City of Monroe, 2019 U.S. Dist. LEXIS 185264, at *16 (W.D. La. Oct. 8, 2019). Therefore, if the Sun Belt did not pay compensation to 20 or more employees at any point during the relevant time period, the Court must dismiss the claims." Fortunately for Hairston, these officials' coordinators provided services to the Sun Belt and were paid for their

---

[7] Despite the fact that the Sun Belt has totally ignored this entire class of employees in its affidavits, we fully expect this to be the argument we hear next.
[8] Plaintiff has outstanding discovery requesting documents related to Defendant's payroll. See R. Doc. 70-3.
[9] https://sunbeltsports.org/news/2020/2/3/mcdaid-named-sun-belt-sec-coordinator-of-football-officials.aspx
[10] https://sunbeltsports.org/staff.aspx

services. Unfortunately, the Sun Belt continues to masquerade under the banner of half-truths and whole lies.

Here, these official coordinators quite literally exist to act as agents of the Sun Belt when it comes to employing additional employees, namely referees. Current Sun Belt Commissioner Keith Gill felt that it was necessary to have a press release when the former Coordinator of Basketball Officials stepped down.[11] The press release quite literally says that "in his role with the Sun Belt." *Id*. A plain reading of this would lead to the conclusion that this individual was clearly employed by the Sun Belt Conference. These coordinators function to identify and hire and manage these crews who are also likely to be employees of the Sun Belt as well. Anyone who has ever seen a college football game on Saturday knows that each conference must have several (usually around seven or eight for a conference this size) officiating crews to referee its games consisting of eight-man crews. These individuals operate under extremely strict rules about how their job is performed that is provided by NCAA and Sun Belt guidance. This would include literally dozens more employees, perhaps even hundreds. This is true for every sport. The Sun Belt maintains the ability to suspend these additional employees from their jobs for poor performance and failure to follow the Sun Belt's rules.[12] That alone is the most obvious method of control in that these employees cannot literally have a job as a college football official in the Sun Belt without the conference hiring them. They are also able to assign them to particular games, set their work hours, force them to work with certain people, force them to work certain positions, and generally have total control over these employees' method, time, and amount of work. The Sun Belt failed

---

[11] https://www.kait8.com/2020/04/21/whitehead-steps-down-sun-belt-coordinator-mens-basketball-officials/
[12] https://www.thenewsstar.com/story/sports/college/ulm/2019/01/14/sun-belt-conference-suspends-officials-ulm-georgia-state-game/2572075002/

to furnish any evidence to refute this reality and instead ignored its employees because they were not a part of its conference staff.

## II. Sun Belt Terminated Hairston Before his Contract Expired, which Caused Damages to Hairston.

The Sun Belt clearly terminated Hairston in breach of his employment agreement, which was guaranteed for at least one year.[13] General obligations provisions have been applied by Louisiana courts in cases such as this one, involving the breach of a fixed term employment contract. *Giron v. Housing Auth. of City of Opelousas,* 393 So.2d 1267 (La.1981). In *Giron,* the plaintiff brought claims for injunctive relief and, in the alternative, monetary damages, because the employer breached a five-year contract without cause. The court awarded damages under La. C.C. arts. 1926–1927, which were the general obligation provisions in effect at that time. In another wrongful discharge case, *Duhon v. Slickline, Inc.,* 449 So.2d 1147 (La.App. 3rd Cir.), *writ denied* 452 So.2d 172 (La.1984), the third circuit court of appeal, relying on this court's decision in *Giron,* ordered reinstatement of an employee with a fixed term contract and awarded damages in the amount of back pay and benefits. Thus, the general obligations articles provide additional remedies available to an aggrieved employee whose contract is breached without cause. *Andrepont v. Lake Charles Harbor & Terminal Dist.*, 602 So. 2d 704, 709 (La. 1992).

Article 1994 of the Louisiana Civil Code provides: "An obligor is liable for the damages caused by his failure to perform a conventional obligation. A failure to perform results from nonperformance, defective performance, or delay in performance." With regard to damages, Article 1996 of the Louisiana Civil Code provides that "[a]n obligor in good faith is liable only for the damages that were foreseeable at the time the contract was made." Article 1996

---

[13] Exhibit A, Deposition of Keith Gill, p. 65.

of the Louisiana Civil Code further provides that "[a]n obligor in bad faith is liable for all the damages, foreseeable or not, that are a direct consequence of his failure to perform." See Generally, <u>Andrepont v. Lake Charles Harbor & Terminal Dist.</u>, 602 So. 2d 704, 709 (La. 1992). Nonpecuniary damages may be awarded when the breach was willful and amounted to an independent tort. See generally, Emergency Physicians Ass'n v. Our Lady of the Lake Regional Medical Center, 635 So. 2d 1148 (La. Ct. App. 1st Cir. 1994).

Various Federal Courts have acknowledged the validity of claims for lost profits and damage to future job prospects. See *Redgrave v. Boston Symphony Orchestra*, 855 F.2d 888 (1st Cir. 1988) *Fields v. United States*, 147 Fed. Cl. 352, 356 (2020), *aff'd*, 844 F. App'x 372 (Fed. Cir. 2021) and *Rice v. Cmty. Health Ass'n*, 203 F.3d 283, 288 (4th Cir. 2000).

Hairston's employment contract was guaranteed through at least June 30, 2020.[14] It is undisputed that he was terminated prior to the date of the expiration of the contract.[15] The Sun Belt argues in an Alice in Wonderland worthy attempt at non-sense that employment does not mean employment. It notified various Sun Belt, NCAA, and other industry professionals that Hairston was terminated prior to the conclusion of his contract.[16] Sun Belt CFO Herbert Carter conceded that Hairston was terminated before the end of his contract.

> Q. The first paragraph of the agreement appoints Patrick the associate commissioner for compliance and governance with the Sun Belt guaranteed through June 30th, 2020, with a minimum salary of $96,000.· Is that your understanding of this agreement?
> A.· Yes.
> Q.· Did Patrick Hairston remain employed through June 30th, 2020?

---

[14] Id. at p. 65.
[15] Id. at p. 65
[16] Exhibit A, Deposition of Keith Gill, p. 69.

A.· I mean, for my purposes, I considered him employed through June 30th, 2020, because I paid him his full benefits and treated him as an employee all the way through the end of his contract.

Q.· Was Patrick Hairston allowed in the Sun Belt office after April 30th, 2020?

A.· Well, he wasn't there, so I -- he no longer did work.

Q.· Did Patrick have to turn in his Sun Belt property?

A.· He did.

Q.· Did other employees who remained employed until June 30 have to turn in their property?

A.· No.

Q.· Was there a e-mail communicating that Patrick no longer worked at the Sun Belt sent to Membership?

A.· There was.

Q.· Did you do that for any other employees who continued working at the Sun Belt?

A.· No.

Q.· Do you think that the individuals that received that e-mail believed that Patrick was still employed? ….

A.· No.[17]

Further, Keith Gill also conceded that Mr. Hairston was terminated prior to his contract.

Q. What does the word "guaranteed" mean to you?

A. "Guaranteed." I mean, "guaranteed" means that's a commitment.

Q. And Mr. Hairston's employment agreement was guaranteed through June 30th of 2020, and then it also put a minimum salary in there. Is that accurate?

A. That's what I read.

Q. He was not employed through June 30th, 2020, was he?

A. Well, he was paid through June 30th,2020.

Q. Was he allowed to access the Sun Belt building, his office, documents after April the 30th of 2020?

A. No. Well, not April 30th, but, no.

Q. Did you tell him that he was terminated prior to June the 30th of 2020?

A. Yes.

Q. And so it's fair to say that he was
not employed through June 30th, 2020?

A. Yes.[18]

As a result, it is quite clear that Hairston was terminated. No serious person would contend

otherwise. The Sun Belt attempts to wipe away all the damage it did by stating that it paid him out

his contract. While that may be one potential form of damages for wrongfully terminating the

---

[17] Exhibit B, Deposition of Herbert Carter Page 63-65.
[18] Exhibit A, Deposition of Keith Gill, p. 65.

contract, it is not the only direct consequence from Hairston's termination. Considering the nature of the entire action, Hairston is also arguing that the breach was in bad faith, which would allow various forms of damages regardless of foreseeability to be considered by a jury. Hairston's inability to obtain a similar job with similar pay in his field is a direct result of his wrongful termination from the Sun Belt.[19] Indeed, the Sun Belt has wrongly labeled his termination as a for cause termination, which has done significant damage to Hairston's future job prospects and ability to be gainfully employed in his highly specialized field.[20] There are only twelve conferences with similar jobs to the one Hairston held. Most of those conferences were aware Hairston was fired almost immediately.[21] This destroyed Hairston's ability to remain employed in this narrow and unique field. Hairston and former Commissioner Karl Benson will testify about his chances of obtaining another job in compliance at a conference after this termination, which is effectively no chance at all. Testimony will also be introduced about the pay at these jobs in comparison with other jobs in higher education leading to an obvious economic loss. Finally, due to the specialized nature of his job, Hairston will be more easily able to demonstrate these damages than most Plaintiffs in similar breach of contract actions. He was forced to go work at an Amazon factory to support his family.[22] He has undergone various economic hardships from this bad faith decision by the Sun Belt.

### III.    Hairston's Vacation Pay was not paid timely and was underpaid.

The Sun Belt failed to pay Hairston's vacation days timely and never paid them entirely. The Louisiana Wage Payment Act (LWPA) requires an employer to "pay the amount then due under the terms of employment...on or before the next regular payday or no later than fifteen days

---

[19] Exhibit J, deposition of Patrick Hairston
[20] *Id.*
[21] Exhibit A, deposition of Keith Gill, page 69
[22] Exhibit J, deposition of Patrick Hairston

following the date of discharge, whichever occurs first." La. R.S. § 23:631. Vacation pay is considered an "amount then due" when an employee has accrued the right to take vacation time with pay and the employee has not been compensated for the time as of the date of discharge. *Id*. Louisiana case law is replete with examples of demands similar to Hairston being construed as demand even if it was not in writing, as no particular form is required. *Kern v. River City Ford, Inc.*, 98-0407, pp. 8-9 (La. App. 1st Cir. 2/19/99), 754 So.2d 978, 983. The court noted that a statutorily sufficient demand for payment does not have to be in writing, and a "fairly precise and certain" oral request for payment is sufficient. See *Kern*, 98–0407 at p. 10, 754 So.2d at 984. Furthermore, an employee's demand for payment need only be made once. *Kern*, 98–0407 at p. 10, 754 So.2d at 984

The Sun Belt admits at the outset of the argument that Hairston did not receive a payment for his vacation pay until June 30, 2020. "On June 30, 2020, the same day he received his final salary payment through Sun Belt's payroll system, Sun Belt paid Plaintiff $3,042.56 for his eight unused vacation days."[23] According to the LWPA, this payment was due 15 days after his discharge since his payments continued for two months after the date of termination. It is undisputed that the Sun Belt failed to timely pay Hairston's vacation days based upon its own admission. Regarding Hairston's email, it certainly constituted a demand for vacation pay as of at least June 29, 2020. The Plaintiff asked how many vacation days he was being paid for, provided the amount he should be paid, and that the Sun Belts records had been referenced by Hairston in his calculation. The mere fact that it was a polite demand does not diminish that it was certainly a demand under the statute with an affirmative position on how many vacation days Hairston actually had and requesting that these days be paid. Furthermore, the Sun Belt remains aware through various

---

[23] R. Doc. 60, p. 18.

communications and this lawsuit that Hairston believes he was not paid his vacation time properly and demands that it be paid. The Sun Belt may not bury its head in the sand to avoid consequences.

Hairston's vacation time was also underpaid. Hairston has contended since June 29, 2020 that his vacation days were short paid by three days.[24] As evidenced by emails from Donna O'Brien to Patrick Hairston, it is clear that the Sun Belt made a willful decision to grant additional vacation days as supported by the language in its policy manual. Further, the attached emails have NOT been produced by the Sun Belt to date, Mr. Hairston luckily saved a copy.[25] At best, his vacation days are the subject of a genuine issue of material fact, as Donna O'Brien actually kept track of vacation days.[26] She provided Hairston with the email ledger of his vacation time.[27] Donna O'Brien will testify that the reduction of vacation time after the fiscal year was not a policy that the Sun Belt actually followed. It was routine for employees to be allowed to use unused vacation time throughout the year. She is in the process of completing an affidavit currently. In fact, O'Brien's spreadsheet[28] does not even contain the same columns as the spreadsheet marked as Defendant's Exhibit E.[29] Namely, the column reducing Hairston's vacation days by three labeled "C/O not used in July."[30] That is because this column was added sometime after Hairston's termination without the knowledge of Donna O'Brien.

In further support, Plaintiff cites to the deposition of Herbert Carter, wherein he states that the Commission may grant holiday periods with full pay which would be in addition to the holidays

---

[24] Exhibits D and E, Hairston's accounting of his vacation days.
[25] *Id.*
[26] Exhibit B, Deposition of Herbert Carter, p. 9-10.
[27] Exhibits D and E, Hairston's accounting of his vacation days.
[28] *Id.*
[29] Defense Exhibit D p. 252-285.
[30] *Id.*

that were in the policy manual. Again, the Sun Belt can't escape its subjective application of its policy manual.[31]

Finally, there is no good faith dispute between Hairston and the Sun Belt, as to Hairston's vacation time. The case mistakenly cited by the Sun Belt, *Steak v. Hat World, Inc.*, 191 So.3d 712, 715-16 (La. App. 4 Cir. 2016) is entirely inapplicable to the facts at hand. That case involved a situation in which the missing vacation time was paid via check in a reasonable amount of time once the employer was notified of the issue. Here, the Sun Belt still refuses to pay the vacation time over two years later. That is not a small accident akin to the facts in the case they cite. The reality is that the Sun Belt had an obligation to pay Hairston's vacation and have failed to do so for years. They should be held liable for their refusal to cooperate with the statute.

## IV. Hairston was the victim of a discriminatory termination.

Mr. Hairston has demonstrated a *prima facie* case of racial discrimination in connection with his termination from the Sun Belt. His evidentiary materials demonstrate that he is an African-American male, he received high marks on his services evaluation results, he was terminated, white employee, Maura Smith, was hired to replace him, and that underlying the regime of the Sun Belt, a racist and toxic work environment was fueled by its leadership.[32] [33] [34]

The deposition of John McElwain shows how the racial animus at the Sun Belt is both deeply entrenched and long-lasting. Prior to his separation with the Sun Belt, Mr. McElwain was one of the Sun Belt's longest tenured employees. In his deposition, Mr. McElwain testified to the preference white employees received over minority employees, specifically between Mr. Hairston

---

[31] Exhibit B, Deposition of Hebert Carter, p. 62-63.
[32] Exhibit F, Deposition of Karl Benson, where he states that Kathy Keene routinely opposed the hiring of racial minorities.
[33] Exhibit G, Deposition of John McElwain, p. 48-49.
[34] Exhibit H, Affidavit of Alexandria Price.

and Scott Connors.[35] Of note, Mr. Connors is a white male. Mr. McElwain testified that Mr. Connors worked in the position Patrick took over after Connors departed the Sun Belt. Mr. Connors had an employee that worked under Connors in the Compliance department. Whereas, Mr. Hairston never had a full-time employee work under him. In fact, Mr. Hairston took it upon himself to seek interns from local colleges to help assist him.[36] Although Mr. Hairston never had a full-time employee like Mr. Connors, Mr. Hairston wasn't allowed to do less work than Connors and held to the same expectations.[37]

Mr. McElwain recalls the strong racially charged language that was used in and around the Sun Belt. Plaintiff directly cites to the following excerpts of Mr. McElwain's deposition:

> There's one occurrence, again, during a primetime game where an incident happened where Scott Connors said to Bert Carter that he was going to "fuck this nigger bitch" and there was a young black woman with him, was my understanding, his intention was he was going to fuck this nigger bitch in his office.[38]

Further, McElwain testified that it was commonplace for the word "nigger" and "nig" to be used in conversation by Mr. Carter.[39] Also, Carter referred to black children running through traffic and comment, "look at these fucking niggers."[40] The use of the racist phrases "nig" or "niggers" was common enough that McElwain cannot recall all the times he heard it.[41] He also believes it was used fairly regularly.

McElwain also testified that he was aware of Kathy Keene and Bert Carter having conversations regarding race. Particularly, when Ms. Keene was overlooked for the position of the

---

[35] Exhibit G, Deposition of John McElwain, p 19-20.
[36] *Id*. at 19.
[37] Exhibit G, Deposition of John McElwain, p 19-20.
[38] Exhibit G, Deposition of John McElwain, p. 23.
[39] Exhibit G, Deposition of John McElwain Page 23, 26, 27.
[40] Exhibit G, Deposition of John McElwain Page 24-25.
[41] Exhibit G, Deposition of John McElwain Page 24-25.

next Sun Belt Commissioner. This upset Ms. Keene. In an effort to console her. Mr. Carter referred to the hiring of Keith Gill as "that black shit" as to the reason Keith Gill got the job and not Kathy.[42] This statement was later confirmed by Ms. Keene herself. As to Ms. Keene, testimony from McElwain substantiates the fact that she treated white employees differently than black employees.[43] As an example, Mr. McElwain testified that white employees were given more responsibility than black employees in similar positions and white employees were treated with favoritism.[44] I.e. Kathy would create menial tasks for black employees, specifically Mr. Wilborn, who would pack up boxes and do behind-the-scenes work versus his white counterpart, Spencer Dodd who did administrative work and is still currently employed by the Sun Belt.[45] Mr. Wilborn was fired on or about the same day as Ms. Hairston.[46] McElwain testified that this treatment was also part of the cycle he witnessed first-hand by Ms. Keene with Mr. Hairston.[47] Ms. Keene acted as if she did not trust him, talked down to him, and pushed him to the side. It was obvious that she had consistently treated black individuals as beneath her.[48] In hindsight, former Commissioner Karl Benson believes that there is a good chance Kathy Keene was secretly harboring racial animus when he was the Commissioner[49]

The racial animus toward African American's was only the beginning. Sun Belt employees also referred to the women who worked at Subway restaurant as "purple pussies" and referred to the Subway as the "purple pussy palace."[50] It was McElwain's understanding that this was due to

[42] Exhibit G, Deposition of John McElwain Page 28-29 and 63.
[43] Exhibit G, Deposition of John McElwain Page 30-31.
[44] Exhibit G, Deposition of John McElwain Page 31.
[45] Exhibit G, Deposition of John McElwain Page 30-35.
[46] Exhibit A, Deposition of Keith Gill Page 103
[47] Exhibit G, Deposition of John McElwain Page 30-35.
[48] *Id.* p. 44 and 71-72.
[49] Exhibit F, Deposition of Karl Benson P. 99-100.
[50] Exhibit G, Deposition of John McElwain 25, 61,72-73.

the women working at the Subway being of Indian or Middle Eastern descent.[51] Further, that the term "Johnny McNguyen" was used to make fun of people of Vietnamese individuals, while also using a racist Asian accent.[52]

Ms. Alexandria Price, a former employee of the Sun Belt, provided an affidavit which details a toxic workplace environment as an African American female.[53] Ms. Price substantiates the animus experienced by Mr. Hairston, wherein she was not given the same opportunities to grow as her white counterparts.[54] Ms. Price details her experience being selected by the NCAA for their Emerging Leaders Conference out of hundreds of applicants. However, she was only allowed to attend if she received the "diversity scholarship." Ms. Price also detailed her fear of being targeted, belittled, harassed or retaliated against by Kathy Keene.[55] Further, that white employees were not required to physically be present in the office, but this did not apply to Ms. Price.[56] In all, Ms. Price believes that Kathy's dismissive and non-inclusive attitude was largely due to her race.[57]

During Benson's tenure he actually sat down McElwain and CFO Herbert Carter to ask if Kathy was racist, due to conduct he observed.[58] Katherine Keene testified and confirmed her racial animus toward the hiring of African American/blacks in her deposition. When Karl Benson made his exit as the Commissioner of the Sun Belt, Ms. Keene put her name in the running to be selected as the new Commissioner. However, Kathy was overlooked, and Mr. Gill was chosen as the first African American FBS Commissioner.[59] This decision upset Ms. Keene as she believed there was

---

[51] Exhibit G, Deposition of John McElwain 25, 61,72-73.
[52] Id. p. 73-74.
[53] Exhibit H, Affidavit of Alexandria Price.
[54] Id.
[55] Id.
[56] Id.
[57] Exhibit H, Affidavit of Alexandria Price
[58] Exhibit G, Deposition of John McElwain, p.69-70.
[59] Exhibit I, Deposition of Katherine Keene, p. 112.

no merit-based reason she was not selected.[60] In an effort to comfort Ms. Keene, she testified that Mr. Carter comforted her by iterating that this was just "Becker and his black shit."[61] When asked if she admonished Mr. Carter for referring to the new minority hire as "black shit." She testified she did not.[62]

The Sun Belt's claims that it terminated Mr. Hairston due to Covid-19 budget cuts are patently false, instead, Sun Belt hired Maura Smith a white female to replace Mr. Hairston.[63] As the sworn testimony from Sun Belt's top officials confirms, the hiring of Ms. Maura Smith, a white female, occurred a month after Mr. Hairston's termination.[64] While budget cuts were the preferred excuse by the Sun Belt, testimony from its top officials confirms that the Sun Belt applied for and received funds from its Payment Protection Plan application.[65] According to Mr. Gill it is believed that approximately $350,000.00 was received by the Sun Belt in April or May of 2020.[66] Herbert Carter testified that as early as March he and First Bank and Trust filled out the PPP application.[67] Carter further confirmed that at the time of Patrick's termination, the Sun Belt had approximately $336,000.00 accessible for it to use.[68] The Sun Belt's claims that it terminated Mr. Hairston due to his requests to work from home are also not supported by the testimony of its top officials. Keith Gill testified that since Ms. Smith's hiring, she has exclusively worked from home and has never worked in the office.[69] Finally, the Sun Belt has argued that Hairston's work was generally

---

[60] Exhibit I, Deposition of Katherine Keene, p. 26.
[61] Exhibit I, Deposition of Katherine Keene, p.112-113.
[62] Id. p. 113
[63] Exhibit A, Deposition of Keith Gill, p. 73.
[64] Exhibit A, Deposition of Keith Gill, p. 73
[65]
[66] Exhibit A, Deposition of Keith Gill, p. 113, 115.
[67] Exhibit B, Deposition of Hebert Carter, p. 59-60.
[68] Exhibit B, Deposition of Herbert Carter, p. 59-60.
[69] Exhibit A, Deposition of Keith Gill, p. 42.

substandard without the ability to provide any evidence. Hairston's former boss Karl Benson disagreed with that assessment.

Mr. Hairston bravely provided his deposition testimony in light of the fact that Mr. Keith Gill was sitting across the table from Plaintiff.[70] Mr. Hairston testified that things began to change at the Sun Belt after Mr. Gill was hired. Mr. Hairston testified that he felt invisible, began to be intentionally left out – specifically in regard to key information that he needed in order to be informed of things going on in the conference office, and further left out of decision making.[71] Further, that although he tried to be a team player Plaintiff was left feeling not included and mistreated by Ms. Keene.[72] This behavior led Plaintiff to believe that, although he worked hard, he wasn't sure where his job with the Sun Belt would wind up.[73] Further, Plaintiff testified that he received high scores on his performance evaluation, and if there was an issue with his work performance, no one from the membership informed him of any issues.[74] In fact, Hairston received the highest marks of any division of the Sun Belt in the questionnaire commissioned by Keith Gill.[75] He also received a positive performance review and a raise.[76] Further, the Defendant's in this case have also failed to furnish any written warnings or specific admonishments of Patrick for his job performance. [77]

> Q. And did you ever counsel Patrick in any sort of formal setting as far as reprimanding anything or addressing any issues with his job?
>
> A. Only that, you know, that at some point in time, he needed to finish that project and trust his instincts that it was done to the best of his ability and to -- to not labor over an email or a report and to trust the fact that he nailed it. **Patrick Hairston is**

---

[70] Exhibit J, Deposition of Patrick Hairston, p. 1-3.
[71] Exhibit J, Deposition of Patrick Hairston, p. 117, 130-131.
[72] Exhibit J, Deposition of Patrick Hairston, p. 133-134.
[73] Id. p. 117.
[74] Exhibit K, Sun Belt Membership Questionnaire and Exhibit L, Hairston's Performance Review.
[75] Exhibit K, Sun Belt Membership Questionnaire.
[76] Exhibit L, Performance Evaluation of Patrick Hairston.
[77] Emails and correspondence regarding Plaintiff's performance are still outstanding discovery matters.

**an overachiever.**· He has overcome, you know, his stuttering.· **I have tremendous respect for the hard work that he has done to allow him to be able to communicate effectively, both as a writer and as a -- in terms of providing oral reports.** And that is done with hard work and a lot of dedication to doing it in a -- in an acceptable way.[78]

Herbert Carter, Deposition

Q. You're not aware of Patrick receiving counseling, a warning, or, and I'm quoting, more serious action prior to April 30th?

A.  I'm not aware of that.[79]

Mr. Hairston respectfully submits that even if the defendant has somehow successfully rebutted the plaintiff's prima facie case, the plaintiff has nevertheless submitted substantial evidentiary materials which create genuine issues of material fact as to pretext and/or mixed motives.

In 2003, the United States Supreme Court decided the case of *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003). In *Rachid v. Jack in the Box*, 376 F. Ed. 305 (5th Cir. 2004), the Fifth Circuit, applied *Desert Palace* to an ADEA claim. In *Rachid*, the Court held:

> if the defendant meets its burden of production, the plaintiff must then offer sufficient evidence to create a genuine issue of material fact either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another 'motivating factor' is the plaintiff's protected characteristic (mixed-motive[s] alternative). Louis v. East Baton Rouge Parish School Board, 303 F. Supp. 2d 799 (M.D. La. 2003).

Mr. Hairston respectfully submits that *Desert Palace* makes significant changes in the analytical framework for deciding motions for summary judgments in employment discrimination cases. In the first place, if the Court determines that the Sun Belt has produced legitimate non-

---

[78] Exhibit F, Deposition of Karl Benson P. 103.
[79] Deposition of Hebert Carter, supra, p. 32

discriminatory reasons to support its decision, *Desert Palace* provides another method to the employee of rebutting that production by showing through circumstantial evidence that the reasons asserted by the employer are either pretextual or there have been mixed motives for the decision. Secondly, in *Desert Palace*, the Supreme Court broadened the scope of circumstantial evidence that can be used to support the employee's case. In *Desert Palace*, the ultimate issue was whether Ms. Costa was terminated due to her sex. While she had no direct evidence on this point, she could point to other acts of gender-based actions by the employer including the fact that harsher discipline had been imposed on her as opposed to that given to males and her frequent exposure to sexual epithets. Mr. Hairston respectfully submits that, under either a pretext or mixed motives analysis, the evidence herein rebuts the bogus reasons given by the Sun Belt for Mr. Hairston's termination and presents questions of fact as presented by the sworn testimony and affidavits in this matter. This case can be crystalized perfectly with the testimony of Karl Benson.

> Q. As far as the minority employees, I will call them, that you left behind on June the 30th, 2019, are any of those individuals still employed with the Sun Belt?
> A. I am sorry, Mark, can you repeat -- of those minority employees?
> Q. That you left behind on June the 30th, 2019, are any of them still employed with the Sun Belt?
> A. No.
> Q. Does that fact upset you?
> A. Disappoints me.

Respectfully submitted,

/s/ *Mark G. Montiel, Jr.*

_____
MARK G. MONTIEL, JR. (#36122)
SHELBY S. TALLEY (#39050)
**MONTIEL HODGE, LLC**
400 Poydras Street, Suite 2325
New Orleans, Louisiana 70130
Telephone: (504) 323-5885
Facsimile: (504) 308-0511
**Counsel for Plaintiff, Patrick Hairston**

## CERTIFICATE OF SERVICE

I, the undersigned counsel in the above styled case, do hereby certify that I have served a copy of the foregoing document by Notice of Electronic Filing or, if the party served does not participate in Notice of Electronic Filing, by U.S. First Class Mail or electronic mail on this 19th day of October, 2022.

*/s/ Mark G. Montiel, Jr.*_____
**MARK G. MONTIEL, JR.**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| PATRICK HAIRSTON, | * | |
| | * | CIVIL ACTION NO: 2:21-cv-02088 |
| Plaintiff, | * | |
| | * | SECTION: G        DIVISION: 3 |
| v. | * | |
| | * | JUDGE: NANNETTE JOLIVETTE |
| SUN BELT CONFERENCE INC., | * | BROWN |
| | * | |
| Defendant. | * | MAGISTRATE JUDGE: DANA |
| | * | DOUGLAS |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

<u>**PLAINTIFFS OPPOSITION TO DEFENDANTS STATEMENT OF MATERIAL FACTS**</u>

  Plaintiff, Patrick Hairston, respectfully submits this Opposition to Defendant's Statement

of Material Facts in Relation to Defendant's Summary Judgment:

1. Admitted.
2. Denied in part. Plaintiff agrees that he was paid on a semimonthly payroll cycle. However, a genuine issues exist as to whether all Defendant's employees are paid on a semimonthly payroll cycle.
3. Denied for lack of sufficient information to justify a belief therein. Sun Belt website shows that it had multiple Officials Coordinators as well as paid officials to referee various games that are not included on their payroll record or affidavits. These include Paul Gillie, Mike Eades, Lisa Mattingly, John McDaid, Rachel Woo, Christie Cornwell, and Anne Pufahl. There are countless referees outside of the knowledge of the Plaintiff at this time. This information has been requested in discovery.
4. Denied for lack of sufficient information to justify a belief therein. Sun Belt website shows that it had multiple Officials Coordinators as well as paid officials to referee various games that are not included on their payroll record or affidavits. These include Paul Gillie, Mike Eades, Lisa Mattingly, John McDaid, Rachel Woo, Christie Cornwell, and Anne Pufahl. There are countless referees outside of the knowledge of the Plaintiff at this time. This information has been requested in discovery.
5. Denied for lack of sufficient information to justify a belief therein. Sun Belt website shows that it had multiple Officials Coordinators as well as paid officials to referee various games that are not included on their payroll record or affidavits. These include Paul Gillie, Mike Eades, Lisa Mattingly, John McDaid, Rachel Woo, Christie Cornwell, and Anne Pufahl. There are countless referees outside of the knowledge of the Plaintiff at this time. This information has been requested in discovery.

6. Admitted.
7. Admitted.
8. Admitted.
9. Admitted.
10. Admitted.
11. Admitted.
12. Admitted.
13. Admitted.
14. Denied for lack of sufficient information to justify a belief therein. Testimony from Karl Benson supports the contention that this was not strictly followed by the Sun Belt.
15. Admitted.
16. Admitted.
17. Admitted.
18. Denied for lack of sufficient information to justify a belief therein. Genuine issues of material fact exist as to the calculation of Plaintiff's vacation days which is still an outstanding discovery matter.
19. Denied for lack of sufficient information to justify a belief therein. Genuine issues of material fact exist as to the calculation of Plaintiff's vacation days which is still an outstanding discovery matter.
20. Denied for lack of sufficient information to justify a belief therein. Genuine issues of material fact exist as to the calculation of Plaintiff's vacation days which is still an outstanding discovery matter.
21. Denied for lack of sufficient information to justify a belief therein. Genuine issues of material fact exist as to the calculation of Plaintiff's vacation days which is still an outstanding discovery matter.
22. Denied for lack of sufficient information to justify a belief therein. Genuine issues of material fact exist as to the calculation of Plaintiff's vacation days which is still an outstanding discovery matter.
23. Denied for lack of sufficient information to justify a belief therein. Genuine issues of material fact exist as to the calculation of Plaintiff's vacation days which is still an outstanding discovery matter.
24. Admitted in part and denied in part. Plaintiff was not "treated as a Sun Belt Employee through June 30, 2020."[1]
25. Admitted as to the payment of $3,042.56.
26. Denied. Plaintiff stated that the best person to ask about vacation pay was Herbert Carter.
27. Admitted in part and Denied in part. As to the statement "unused vacation time" which is in dispute and still a matter currently being discovered.
28. Denied for lack of sufficient information to justify a belief therein. Genuine issues of material fact exist as to the calculation of Plaintiff's vacation days which is still an outstanding discovery matter.

---

[1] Audio recording of Plaintiff's termination.

29. Admitted to the extent that the Sun Belt emailed Plaintiff proof of what it believed to be payment for Plaintiff's unused vacation days.
30. Admitted.
31. Admitted.
32. Admitted.
33. Admitted.
34. Admitted in part and denied in part. Plaintiff testified that part of his role was to provide interpretation.[2]
35. Denied in part.
36. Admitted.
37. Denied in part. Katherine Keene testified that she also played a role in the compilation of information.
38. Admitted.
39. Denied. Plaintiff testified that he spoke to Keith Gill regarding a matter related to Katherine Keene., which is substantiated by deposition testimony of Keith Gill.
40. Admitted.
41. Denied for lack of sufficient information to justify a belief therein. Genuine issues of material fact exist as Karl Benson did not testify that issues existed with Plaintiff's communication to staff.[3]
42. Admitted in part and Denied in Part. Admitted that Gill's official status as Commissioner was on May 1, 2019, denied in part as Gill testified he was hired in March.[4]
43. Admitted.
44. Admitted to the extent Gill testified that he, "started a performance evaluation process that hadn't been in place when I was there."[5]
45. Denied for lack of sufficient information to justify a belief therein.
46. Denied for lack of sufficient information to justify a belief therein. Katherine Keene testified that Keith Gill allowed "Nancy" to work remotely.[6]
47. Admitted.
48. Denied.
49. Denied as to proximity. Katherine Keene testified that they let employees return to the Superdome in June.[7]
50. Admitted.
51. Admitted.
52. Denied for lack of sufficient information to justify a belief therein. Correspondence and objective emails to substantiate this statement are part of the outstanding discovery matters.
53. Denied for lack of sufficient information to justify a belief therein. Correspondence and objective emails to substantiate this statement are part of the outstanding discovery matters.

[2] See Deposition of Patrick Hairston.
[3] See Deposition of Karl Benson.
[4] Deposition of Keith Gill, p. 13.
[5] Deposition of Keith Gill.
[6] Deposition of Katherine Keene.
[7] Deposition of Katherine Keene.

54. Admitted.

55. Admitted.

56. Denied. Keith Gill testified that as a result of this phone call he had a meeting with both Plaintiff and Kathy.[8]

57. Denied for lack of sufficient information to justify a belief therein. Correspondence and objective emails to substantiate this statement are part of the outstanding discovery matters.

58. Denied for lack of sufficient information to justify a belief therein. Correspondence and objective emails to substantiate this statement are part of the outstanding discovery matters.

59. Denied for lack of sufficient information to justify a belief therein. Correspondence and objective emails to substantiate this statement are part of the outstanding discovery matters.

60. Denied for lack of sufficient information to justify a belief therein. Correspondence and objective emails to substantiate this statement are part of the outstanding discovery matters.

61. Denied for lack of sufficient information to justify a belief therein. Correspondence and objective emails to substantiate this statement are part of the outstanding discovery matters.

62. Admitted.

63. Denied. Katherine Keene testified that Keith Gill talked with herself and Herbert Carter in a meeting regarding Patrick's termination.[9]

64. Denied for lack of sufficient information to justify a belief therein. Correspondence and objective emails to substantiate this statement are part of the outstanding discovery matters.

65. Denied for lack of sufficient information to justify a belief therein. Correspondence and objective emails to substantiate this statement are part of the outstanding discovery matters.

66. Denied for lack of sufficient information to justify a belief therein. Correspondence and objective emails to substantiate this statement are part of the outstanding discovery matters.

67. Denied for lack of sufficient information to justify a belief therein. Correspondence and objective emails to substantiate this statement are part of the outstanding discovery matters.

68. Denied for lack of sufficient information to justify a belief therein. Correspondence and objective emails to substantiate this statement are part of the outstanding discovery matters.

69. Denied for lack of sufficient information to justify a belief therein. Correspondence and objective emails to substantiate this statement are part of the outstanding discovery matters.

70. Denied for lack of sufficient information to justify a belief therein. Correspondence and objective emails to substantiate this statement are part of the outstanding discovery matters.

71. Denied for lack of sufficient information to justify a belief therein. Correspondence and objective emails to substantiate this statement are part of the outstanding discovery matters.

72. Denied for lack of sufficient information to justify a belief therein. Correspondence and objective emails to substantiate this statement are part of the outstanding discovery matters.

73. Admitted.

74. Denied for lack of sufficient information to justify a belief therein. Correspondence and objective emails to substantiate this statement are part of the outstanding discovery matters.

75. Admitted.

---

[8] Deposition of Keith Gill.
[9] Deposition of Katherine Keene.

76. Admitted to the extent that Kathy Keene, Keith Gill, or Hebert Carter made comments directly to Plaintiff related to race or derogatory racial comments.

77. Admitted in part to the extent that this is a portion of the testimony of Plaintiff.

78. Denied. Plaintiff testified as to his work relationship, alleged budget cuts, and manner of firing.

79. Denied. Plaintiff testified as to his work relationship, alleged budget cuts, and manner of firing.

80. Admitted in part.

81. Admitted to the extent that this is what Keith Gill told Plaintiff.

82. Denied as written.

83. Denied as written, Plaintiff testified that Kathy Keene was part of his termination phone call.

84. Denied as written, Plaintiff testified that Bert Carter was part of his termination phone call.

85. Admitted.

Respectfully submitted,

/s/ *Mark G. Montiel, Jr.*

_____
MARK G. MONTIEL, JR. (#36122)
SHELBY S. TALLEY (#39050)
**MONTIEL HODGE, LLC**
400 Poydras Street, Suite 2325
New Orleans, Louisiana 70130
Telephone: (504) 323-5885
Facsimile: (504) 308-0511
**Counsel for Plaintiff, Patrick Hairston**

## CERTIFICATE OF SERVICE

I, the undersigned counsel in the above styled case, do hereby certify that I have served a copy of the foregoing document by Notice of Electronic Filing or, if the party served does not participate in Notice of Electronic Filing, by U.S. First Class Mail or electronic mail on this 19th day of October, 2022.

/s/ *Mark G. Montiel, Jr.*_____
**MARK G. MONTIEL, JR.**